**KIRKWOOD AGRI–TRADE, A Corporation, Plaintiff-Appellee Cross Appellant,**

v.

**FROSTY LAND FOODS INTERNATIONAL, INC., An Alabama Corporation, Defendant-Appellant Cross Appellee.**

**No. 80–7784 Summary Calendar.**

United States Court of Appeals, Fifth Circuit. Unit B

July 13, 1981.

---

Albert W. Copeland, E. Terry Brown, Montgomery, Ala., for defendant-appellant cross-appellee.

John M. Bolton, III, Montgomery, Ala., for plaintiff-appellee cross-appellant.

Before TJOFLAT, VANCE and THOMAS A. CLARK, Circuit Judges.

VANCE, Circuit Judge:

This is a diversity suit governed by Alabama law. On November 24, 1976 Kirkwood Agri-Trade, Inc. contracted with Frosty Land Foods International, Inc. to purchase Frosty Land's entire production of unscalded Mountain Chain Tripe [1] from December 1, 1976 to December 31, 1977 at a price of $1.20 a pound. The contract estimated that production would be ten to twelve thousand pounds a month, to be shipped "semi-monthly" or when twenty to

---

1. Tripe refers to the stomach of a bovine. There are four basic kinds of tripe, each referring to one of the four bovine stomachs. Tripe must be processed to meet government standards of edibility. Although the United States requires edible tripe to be scalded, there are some countries which accept unscalded tripe. In the United States the most popular form of beef tripe is honeycomb, made from the reticulum or second stomach of the cow. Moutain Chain tripe, or beef rumen pillars, is made from the first stomach, the rumen. It is the heaviest and meatiest form of tripe. For use of tripe, taste, e. g., tripes a la nicoise, cited in 2 J. Child and S. Beck, Mastering the Art of French Cooking 244–46 (1970).

twenty-five thousand pounds were ready. Such output contracts are valid under Alabama law. Ala. Code § 7–2–306; *see Darden v. Ogle*, 293 Ala. 699, 704, 310 So.2d 182, 186 (1975). In fact, no tripe was ever delivered by Frosty Land to Kirkwood.

The only issue before this court is the computation of damages. By unpublished opinion, No. 79–2950 (5th Cir. Apr. 1, 1980) another panel of this court ruled that the award of damages was governed by Ala. Code § 7–2–713:

> (1) Subject to the provisions of this article with respect to proof of market price ... the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article ... but less expenses saved in consequence of the seller's breach.

The major difference between the parties is their contentions regarding "the time when the buyer learned of the breach."

Toward the end of December Kirkwood telephoned Frosty Land several times to ask about the tripe. Frosty Land responded each time that no tripe had been produced yet, but left the implication that production would start in the future. Not until April did Frosty Land unequivocally inform Kirkwood that it would produce no tripe at all. On these facts Frosty Land claims that Kirkwood learned of the breach in December, when the market price for tripe was below the contract price. Kirkwood, on the other hand, claims it learned of the breach in April, when the market price for tripe was considerably higher. The district court agreed with Kirkwood, but held that Kirkwood was only entitled to damages for the nine months remaining to the contract. Both sides appeal.

Both parties overlook the significance of the periodic deliveries called for in the contract. This aspect of the agreement transforms it into an installment contract, Ala. Code § 7–2–612. To determine the time Kirkwood learned of the breach, we must identify the time the breach occurred under the rules regarding installment contracts.

According to the contract, Frosty Land was to ship the tripe semi-monthly or when it had produced twenty to twenty-five thousand pounds. The contract estimated that Frosty Land would produce ten to twelve thousand pounds monthly. Hence, Frosty Land should have sent its first shipment by two months or so at the latest, that is, by late January 1977. Its failure to do so clearly constituted a default.

Default on a single installment, however, is not necessarily equivalent to a breach of the whole contract. On the contrary, official comment 6 to § 2–612 of the U.C.C., from which Ala. Code title 7 derives, specifically asserts that the law "is designed to further the continuance of the contract in the absence of an overt cancellation."[2] This approach coincides with that traditionally adopted in Alabama.

> A delivery of only a part of the quantity ordered, or a failure to deliver any part of it, does not terminate the contract, unless the plaintiffs saw proper to so treat and regard it. The contract continues, as to future orders, during the period stipulated. Each delivery is considered in the nature of a separate and distinct contract.

*Johnson & Thornton v. Allen & Jemison*, 78 Ala. 387, 391 (1884–85). In the case at bar, neither party offered any evidence suggesting it considered the contract terminated when the first shipment failed to arrive. The trial court found, on the contrary, that Frosty Land led Kirkwood to believe that it intended to begin production, and this find-

---

**2.** The official comments are not themselves part of the statute. However, when "the issue presented on ... appeal is one of first impression ... we look for guidance to the Uniform Commercial Code itself, the official Comments to the Code, the writings of commentators, and the case law of other jurisdictions." *Massey-Ferguson Credit Corp. v. Wells Motor Co.*, 374 So.2d 319, 321 (Ala.1979).

ing is not clearly erroneous. Therefore, this first default was not a breach of the entire contract.

The failure to make the second delivery by early April was treated differently. This time, when Kirkwood contacted Frosty Land, Frosty Land said that not only had it produced no tripe, but that it would produce none in the future. We agree with the trial court that this response terminated the entire contract. *See, e. g., Oloffson v. Coomer,* 11 Ill.App.3d 918, 296 N.E.2d 871 (1973).

In determining damages under Ala. Code § 7–2–713, therefore, we must distinguish between the two separate breaches. When this case was remanded previously, the trial court asked both parties if they thought there was enough evidence in the record to fix damages. Both parties, each aware of the other's contentions, agreed that there was. On that basis, we reach the following conclusions:

■ Regarding the default on the first delivery, Kirkwood certainly learned of the breach by the end of January. The only evidence in the record on market price at this time, provided by Kirkwood's president, indicates that the market price of tripe during that period was at or below the contract price. Hence, the district court was correct in not awarding Kirkwood damages for the first two months of the contract.

■ Regarding the second default and breach of the entire contract, the court estimated the market price at $1.48 per pound at the time Kirkwood learned of the breach. Frosty Land objects to this finding. It argues that the estimate was based on spot contracts not made in Montgomery, the place of tender. Ala. Code § 7–2–713(2) states that damages are to be determined based on the market price at the place of tender. Only if that market price is not readily available may other measures be used. Ala. Code §§ 7–2–712, official comment 3, 7–2–723(2). Frosty Land contends that no showing was made that a market price in Montgomery was not readily available.

Frosty Land has probably waived this point by agreeing in its response to the trial court's inquiry that there was enough evidence in the record to fix damages. Frosty Land was, after all, aware of Kirkwood's position, and knew the trial court might rule against it. In any case, there was testimony at the trial that the various individual contracts for sale of tripe reflected the prevailing market price. That testimony suffices to support the trial court's finding against a claim that it was clearly erroneous. Thus, we affirm the trial court's finding of market price for the second breach, but hold that it should be extended to cover the entire period of the breach, from February to the end of December.

■ The trial court did not deduct the costs Kirkwood would have incurred in shipping the tripe to its buyer. We agree that, under the circumstances of this case, these costs do not fall into the category of "expenses saved in consequence of the seller's breach" under Ala. Code § 7–2–713(1).

In summary, damages should be adjusted to the difference between $162,800 (the market price of $1.48 per pound of 110,000 pounds, using the trial court's estimate of 10,000 pounds produced and sold per month for eleven months) and $132,000 (the contract price for 110,000 pounds), or $30,800 together with interest from the date of the prior judgment of July 30, 1980. We remand so that a modified judgment may be entered accordingly.

AFFIRMED IN PART, MODIFIED IN PART AND REMANDED.